**Affirmed and Memorandum Opinion filed February 20, 2014.**



In The

# Fourteenth Court of Appeals

## NO. 14-12-00971-CR
## NO. 14-12-01011-CR

**FRANKIE RAYSHAWN HILL-TURNER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 434th Judicial District Court**
**Fort Bend County, Texas**
**Trial Court Cause Nos. 10-DCR-056063 & 10-DCR-056064**

## M E M O R A N D U M   O P I N I O N

Appellant Frankie Rayshawn Hill-Turner was convicted by a jury of murder and aggravated robbery. The jury sentenced him to 55 years' confinement for murder and 20 years for aggravated robbery (to be served concurrently). In his sole issue, appellant contends the evidence is insufficient to support the jury's implicit rejection that appellant acted in self defense when he shot the complainant. We

affirm.

# I.    FACTUAL AND PROCEDURAL BACKGROUND

### *The Complainant's Testimony*

Trevis McCarty, the complainant in the aggravated robbery charge, testified that he knew Robert Hall, the complainant in the murder charge, because McCarty supplied Hall with drugs to sell. McCarty met appellant when Hall and appellant were with a mutual friend, Danielle, who asked McCarty to provide two cigarettes dipped in PCP, known as sherms. McCarty drove to Danielle's house, left the sherm cigarettes, and drove home. A few days later appellant arranged to trade a diamond bracelet for two more sherm cigarettes. McCarty met appellant at appellant's house and gave appellant two sherm cigarettes plus ten dollars in exchange for the bracelet.

On the night of the offense McCarty and Hall were "hanging out" at McCarty's home. Appellant phoned McCarty and asked to purchase one ounce of PCP, which McCarty called a "strac." McCarty told appellant that the bracelet appellant had traded for drugs earlier in the week was not made with real diamonds. Appellant agreed to reimburse McCarty for the earlier purchase of sherm cigarettes, and agreed to pay for the ounce of PCP. McCarty agreed to go to appellant's house to conduct the transaction, then drive Hall home.

McCarty had $678 in cash from a previous drug sale. He placed $78 in cash in the top pocket of his shorts. He was wearing cargo shorts, which had lower pockets near his knees. He placed $600 and a one ounce bottle of PCP in the lower left pocket. In the other lower pocket, he placed another one ounce bottle of PCP. McCarty's wallet was in his left back pocket, and his mobile phone was clipped to his belt.

McCarty and Hall left McCarty's home in McCarty's car. When McCarty and Hall arrived at appellant's home, appellant got in the car and asked McCarty to drive away from his home. Appellant explained that he and his girlfriend had been arguing and he was afraid she might call the police. McCarty drove to a nearby convenience store and purchased cigarettes. All of the men got back in the car with McCarty in the driver's seat, Hall in the front passenger seat, and appellant riding in the rear passenger seat behind Hall. As they drove back toward appellant's house, appellant told McCarty to turn on a street approximately one block before the street on which appellant lived. McCarty testified that as he turned on that street he saw a white Cadillac and remarked that it might be the same white Cadillac that was parked in front of appellant's house earlier. McCarty said at that point appellant "got suspicious and he shot me."

McCarty stopped the car and tried to get out; appellant walked to the driver's door, pulled McCarty out of the car, and hit him in the head with the gun. McCarty testified that Hall also stepped out of the car. Appellant then held the pistol to McCarty's head and demanded to know where the PCP was located. McCarty told appellant the PCP was in the car even though it was in his pocket. McCarty hoped that appellant would leave him alone and McCarty could get back in the car and escape. Appellant took McCarty's phone and his wallet and searched McCarty's top pocket, but did not find anything. Appellant and Hall then got back in the car and drove away. McCarty eventually flagged down a vehicle and asked the driver to phone 911. McCarty testified that neither he, nor Hall, had a gun, and there was no gun in the front seat of the car.

### Appellant's Statement

Appellant gave a statement to police officers in which he stated that he, McCarty, and Hall drove to the store to buy cigarettes. After McCarty purchased

3

cigarettes they got back in the car with McCarty driving, Hall in the front passenger seat, and appellant in the rear passenger seat. Appellant claimed that McCarty turned on the wrong street, and appellant attempted to give McCarty directions to his house. At that moment, according to appellant, McCarty abruptly stopped the car and reached for a gun with his left hand. Appellant grabbed the gun from McCarty's hand and immediately began firing. Hall reached over the front seat to try to get the gun. Appellant jumped out of the car and hit McCarty in the head several times with the gun. Appellant then jumped back in the car and drove away. He abandoned the car, left it running, and ran home. Appellant stated that Hall was still inside the car when he ran home. Appellant told police he left the gun at the scene and burned his shirt that was covered with blood.

### *Police Investigation*

Houston police officer Salim Howze responded to the 911 call. After talking with the individual who made the call, Howze searched for appellant's car. He found the car nearby, still running with the driver's door open. He observed a body near the front passenger side tire. Detective Kevin Tolls, who responded to the scene where the car was found, testified that the car was still running, the body was near the car, and appeared to have been dragged. The car appeared as if someone had searched it.

Clay Davis, a criminalist with the Houston Police Department, testified that there was a mixture of DNA in the vehicle from McCarty, Hall, and appellant. Davis further testified that the DNA tested from the blood on the front passenger seat headrest was consistent with Hall's profile, and was inconsistent with McCarty or appellant's profile.

Richard Bolton, an investigator with the Houston Police Department, testified that he investigated the robbery–homicide and determined that the white

4

Cadillac was not involved in the incident. Bolton arrested appellant and took his statement. The gun was never recovered.

### *Blood-Spatter Expert Testimony*

Christopher Duncan, the State's blood-spatter expert, testified that he was contacted by the Houston Police Department to conduct an analysis of blood spatter in the car. Duncan spoke with the investigating officers, reviewed the offense report and the autopsy report, and reviewed scene photographs. He hypothesized that one of the victims was shot while seated in the front driver's seat, and that after the driver was shot he exited the vehicle. It also appeared someone had gotten into the seat after the victim had been removed. It did not appear that a person had been shot while sitting in the passenger seat. Duncan opined that the second person who was injured was "in or around the doorway of the back right side of the vehicle." Duncan saw nothing in the physical evidence that would contradict McCarty's version of events. Duncan testified that the blood on the passenger side headrest could have come from McCarty, the driver. He also testified that, according to the blood-spatter evidence, Hall most likely was shot when a part of his body was outside the car.

Louis Akin, the defendant's blood-spatter expert, hypothesized that appellant was sitting in the rear passenger seat when he fired the shots. It appeared Hall dove from the front seat toward the back seat to "go after" the gun as appellant had reported. Akin testified that whoever left the blood on the passenger headrest would most likely not have survived. Akin compared gum found on the bottom of Hall's shoe with smeared gum on the floor of the front passenger side of the car. He testified that the two pieces of gum and the way they were positioned was consistent with appellant's statement that Hall leapt from the front seat to the back seat as appellant described.

5

Appellant was convicted of murder and aggravated robbery. In a single issue, appellant argues the evidence is insufficient to support the jury's implicit rejection that he acted in self defense when he shot McCarty and Hall.

## II.     STANDARD OF REVIEW

In evaluating the legal sufficiency of the evidence, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). Because the factfinder views the evidence first-hand, the factfinder is in the best position to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from the evidence. *See Jackson*, 443 U.S. at 319; *Laster*, 275 S.W.3d at 517 ("[U]nlike the factfinder—who can observe facial expressions and hear voice inflections first-hand—an appellate court is limited to the cold record."). We presume that the factfinder resolved any conflicts in favor of the verdict and must defer to that resolution, as long as it is rational. *Jackson*, 443 U.S. at 326. "After giving proper deference to the factfinder's role, we will uphold the verdict unless a rational factfinder must have had reasonable doubt as to any essential element." *Laster*, 275 S.W.3d at 517.

## III.     ANALYSIS

To obtain a conviction for murder, the State was required to prove that appellant (1) intentionally or knowingly caused the death of an individual; or (2) intended to cause serious bodily injury and committed an act clearly dangerous to human life that resulted in the death of an individual. Tex. Penal Code § 19.02(b)(1)–(2). A person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself

6

against the other's use or attempted use of unlawful force. Tex. Penal Code § 9.31(a). A person is justified in using deadly force: (1) if he would be justified in using force under section 9.31 of the Texas Penal Code; and (2) when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. *Id*. § 9.32(a)(1), (2)(A).

In resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence that refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt. *See Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *Hernandez v. State*, 309 S.W.3d 661, 665 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). Defensive evidence that is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence. *Saxton*, 804 S.W.2d at 914.

Appellant admitted shooting both McCarty and Hall after grabbing the gun from McCarty. McCarty testified that appellant shot him, stole his wallet and phone, and attempted to steal the PCP. Appellant contends that it was unreasonable for the jury to reject his argument that he acted in self defense. Appellant argues that McCarty was not a credible witness and the defense's theory is supported by the physical evidence. Specifically, appellant contends the blood evidence revealed that Hall was most likely not outside of the vehicle when he was shot as the State's expert opined. The jury heard conflicting testimony from McCarty and appellant as

7

to how the offenses occurred. They also heard conflicting hypotheses from experts about how the offenses could have occurred. The jury was free to believe McCarty's testimony as to how the events occurred. The blood spatter experts offered hypotheses as to where the bodies might have been positioned, but the fact that appellant's theory is supported by his expert witness does not render the State's evidence insufficient. *See Saxton*, 804 S.W.2d at 914.

Any alleged inconsistencies in the witnesses' testimony concern the credibility and weight to be given their testimony. *See Lancon v. State*, 253 S.W.3d 699, 705–07 (Tex. Crim. App. 2008). To the extent the testimony is inconsistent, the jury as the trier of fact had the ultimate authority to determine the credibility of witnesses and the weight to be given to their testimony. *See* Tex. Code Crim. Proc. art. 38.04; *Garcia v. State*, 919 S.W.2d 370, 382 n. 6 (Tex. Crim. App. 1996). Any inconsistencies in the testimony should be resolved in favor of the jury's verdict in a legal-sufficiency review. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988); *Draper v. State*, 335 S.W.3d 412, 415 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd).

Considering all of the evidence in the light most favorable to the verdict, we conclude the evidence is sufficient to support the jury's implicit rejection of appellant's claim of self defense. We overrule appellant's sole issue on appeal and affirm the judgment of the trial court.


/s/     Tracy Christopher
Justice

Panel consists of Justices Boyce, Christopher, and Brown.
Do Not Publish — Tex. R. App. P. 47.2(b).